TEXAS & NEW ORLEANS RAILROAD COMPANY V. MRS. MATTIE B. CROW ET AL.

No. 5067.   Decided April 21, 1932.
(48 S. W., 2d Series, 1106.)

*Baker, Botts, Parker & Garwood,* of Houston, *Singleton & Bevil,* of Kountze, *F. J. and C. T. Duff,* of Beaumont, for plaintiff in error.

Where a country crossing is open and unobstructed, it is not negligent to run a train over it at the usual and scheduled speed of 30 to 50 miles per hour; all statutory signals having been complied with, as well as, additional warnings of the train's approach having been given.   McDonald v. International Great Northern Railroad, 86 Texas, 1; Lake Shore R. Co. v.

Barnes, 166 Ind., 7, 76 N. E., 629, 3rd L. R. A. (N. S.), p. 778.

In submitting a case on special issues, the jury's answers should be confined to the issues as made by the pleading and proof and it is error to ask such general questions so that it cannot be determined for the jury's answers to said general questions what facts and circumstances, whether raised by the pleading and proof or not, that the jury based their answers on. Texas & N. O. v. Moore (Civ. App.), 271 S. W., 126; Gulf, C. & S. F. v. Anson, 101 Texas, 198, 105 S. W., 989; Lancaster v. Green (Civ. App.), 245 S. W., 1040.

The law requires a person, about to use a railroad crossing, to exercise reasonable diligence to discover if a train is approaching and where the testimony is conclusive that the deceased failed to exercise any diligence of any kind or character to discover if a train was approaching and that if diligence had been exercised by the deceased, the discovery would have been made, the deceased will be guilty of negligence as a matter of law. Galveston, H. & S. A. v. Price, 240 S. W., 524; San A. & A. P. v. Singletary, 251 S. W., 325; Frias v. Galveston, H. & S. A., 266 S. W., 547.

*E. B. Pickett, Jr.* and *C. H. Cain,* both of Liberty, for defendants in error.

It is certainly a settled proposition in this State that a railroad company may be guilty of negligence in running a train over a public road crossing at a rapid and dangerous rate of speed, and is liable for any injury or damage proximately caused by such negligence. And while it would not be negligence, as a matter of law, for the appellant to run its trains over the crossing in question, at a speed of thirty to fifty miles per hour, as stated in appellant's first proposition, but, under the facts of this case, an issue of negligence in respect to the train's rate of speed was raised, and the court, therefore, properly submitted same to the jury for determination. And the jury having answered the special issues submitted to it in reference to this question against appellant, it is now conclusively bound thereby. Missouri, K. & T. Ry. Co. v. Luten, 203 S. W., 914; Galveston, H. & S. A. Ry. Co. v. Streich, 281 S. W., 296; Texas & N. O. Ry. Co. v. Cunningham, 168 S. W., 428; Lancaster v. Browder, 256 S. W., 905; Beaumont, S. L. & W. Ry. Co. v. Sterling, 260 S. W., 320; International & G. N. Ry. Co. v. Starling, 41 S. W., 181; Cartwright v. Canode, 106 Texas, 502, 171 S. W., 697; Kansas City, M. & O. Ry. v. Perry, 6 S. W. (2d) 111; Galveston, H. & S. A. Ry. Co. v. Leifeste, 8 S. W. (2d) 764.

It is manifest from the record that deceased could not properly be adjudged guilty of neglicence, as a matter of law, but the question of whether any negligence of deceased caused or contributed to cause his death, was properly submitted to the jury, such issue having been raised by the evidence, and the negative answer made by the jury thereto conclusively binds the appellant. Texas & Pac. Ry. v. Murphy, 46 Texas, 364; Gulf, C. & S. F. Ry. Co. v. Shieder, 88 Texas, 165, 30 S. W., 902; Lee v. International & G. N. Ry., 89 Texas, 588, 36 S. W., 63; Trochta v. Missouri, K. & T. Ry., 218 S. W., 1038; Texas & N. O. Ry. v. Harrington, 235 S. W., 193; Galveston, H. & S. A. Ry. v. Freeman, 273 S. W., 979; Freeman v. Galveston, H. & S. A. Ry., 285 S. W., 607, and same case, 287 S. W., 902; Dollar, etc. v. McEwen, 273 S. W., 891; Galveston, H. & S. A. Ry. v. Duty, 277 S. W., 1057.

MR. JUDGE HARVEY, of the Commission of Appeals, delivered the opinion for the court.

On the night of March 19, 1924, C. C. Crow was struck and killed by a west bound passenger train of the Texas and New Orleans Railroad Company, at a public road crossing in the town of Nome. This suit was brought by his widow, Mattie B. Crow, for herself and as next friend for her three minor children, to recover damages on account of Crow's death. From a judgment in favor of the plaintiff, the railroad company appealed, and the judgment was affirmed by the Court of Civil Appeals, 300 S. W., 93.

The case was tried to a jury, on special issues. Among these was Special Issue No. 5, which reads as follows:

"As the train in question approached and ran upon the crossing in question, was said train running at a rapid and dangerous rate of speed, under all the facts and circumstances surrounding the operation of said train at the time it approached and ran upon and across said crossing?" The jury answered "Yes." In answer to Special Issues 6 and 7, the jury found that the company was guilty of negligence in so running said train at such rapid and dangerous rate of speed at that time and place, and that such negligence was the proximate cause of the collision, and of the death of Crow.

The railroad company contends, in effect, that there is no evidence to support the verdict in the above respects. The following facts are shown in evidence:

Nome is a small town about twenty-one miles west of Beaumont. The surrounding country, for several miles, is flat prairie.

The railroad runs east and west through the town, and is straight for several miles on either side of the crossing in question. The public highway from Beaumont to Nome runs west along the south side of the railroad track, and about ninety feet therefrom. On reaching a point opposite the crossing in question, the highway abruptly turns north and passes over the mainline track at said crossing. This crossing is much used by the travelling public at all hours of the day. An electric crossing bell, of the sort in common use by railroads, was at the crossing. It stood on the north side of the railroad. This bell was in good working order and was ringing on the occasion in question. The passenger depot stands on the north side of the track and about 150 feet west of the crossing. A few feet south of the track, and about 230 feet west of the crossing, stands the freight depot, which together with a warehouse and other structures in that vicinity, would prevent a traveler on said highway from seeing a train beyond said 230 foot point, until he got to a point about twelve or fifteen feet of the crossing. About 100 feet east of the crossing, a side track diverges from the mainline track, and runs along the south side thereof, and about twelve feet therefrom, for some 3,200 feet east, where it rejoins the mainline track. About fifty feet south of the mainline at the crossing, a different side track crosses the highway.

On the night in question, Crow was travelling west, in a Ford coupe, from Beaumont to Nome, along the highway above mentioned. It had rained that afternoon, and the road was very muddy. The night was chilly and cloudy; a stiff north wind was blowing, and a drizzling rain fell at intervals, but no rain was falling at the particular time of the accident in question. The windows on the right hand side of Crow's coupe were closed. A negro named Johnson was travelling just ahead of Crow on the highway. Johnson was driving a Ford truck for Crow. They purposed to cross the railroad at the crossing in question.

The west bound train in question was scheduled to pass an east bound passenger train at Nome, without stopping. This west bound train was due to leave Beaumont at 7:56. It left there from five to seven minutes late. In running the twenty-one miles to Nome, it made up this loss and arrived at the latter place on schedule time, to-wit: 8:29. As the west bound train approached Nome, the east bound train (a long passenger train) had just passed over the crossing in question, and entered upon said side track which diverged from the mainline

track about 100 feet east of the crossing. The rear end of this east bound train had to be at least 259 feet east of the crossing in order to clear the mainline track on which the west bound train was running. According to the testimony of most of the witnesses, this train, when the west bound train passed it, had moved up near the eastern extremity of the side track, and was standing there,—thus placing the rear end of the east bound train some 2,000 feet or more from the crossing. But there is some evidence contradicting this, as we shall point out in the course of this opinion. The electric headlight of the locomotive drawing the west bound train was burning brightly and, where no obstruction intervened, its rays of light illuminated the right of way for a distance of 100 feet on either side of the track, and for a long distance down the track in front of the train. The locomotive whistle was blown eighty rods from the crossing, and the bell was rung continuously from that point until the crossing was reached. The jury specifically found that the whistle was thus sounded and the bell thus rung. During said period, however, there was no other signal given by the operatives of the train, nor was the speed of the train reduced.

We now return to Crow and Johnson. As has been stated, the latter was driving a truck along the highway just ahead of Crow. There were no curtains on the right hand side of the truck; and while Johnson was still on the highway before reaching the turn to the crossing, he, Johnson, heard the whistle of the west bound train. Being thus apprised of the approach of the train he stopped his truck when he made the "turn" to the crossing. From this point onward to the crossing the road was gravelled, but there were some "chug holes" in it. Crow passed the standing truck, on the left side of the truck, and continued on to the crossing, at the rate of about ten miles per hour. The front wheels of the coupe which Crow was driving had just cleared the south rail of the mainline track when the collision occurred. The coupe was demolished and Crow was killed. Johnson testified that at the time Crow passed him at the "turn" the west bound train could not be seen, on account of the east bound train intervening, but that the reflection of its headlight could be seen, and was seen by Johnson, above the coaches of the east bound train and along the north side of the right-of-way. Johnson did not hear the crossing bell or the locomotive bell of the west bound train.

The engineer and the fireman on the west bound train testified that as their train was approaching Nome, and before the whistle had been sounded for the crossing in question, they

saw the east bound train on the side track, and that the headlight of the locomotive drawing the latter train still was burning brightly; that under the company's rules, the headlight was required to be dimmed when said train had cleared the mainline track. The dimmed headlight would signify to the operatives of the west bound train that the train on the side track had sufficiently cleared the mainline track to allow the west bound train to pass. The engineer of the west bound train testified, however, that upon his giving signal blasts from the whistle of his locomotive, the headlight on the other locomotive was dimmed. It was after this that the signals for the crossing in question were given by the west bound train. As the train continued on to the crossing in question, the fireman of the west bound train was at his station in the engine cab, on the south side of the cab, and was keeping a lookout for travellers about to use the crossing. He testified that the Crow coupe was about fifty feet south of the crossing, moving toward the crossing, when he first saw it; that the locomotive was, at that time, about 500 feet east of the crossing; that when the train got about seventy-five feet from the crossing he realized that the coupe was not going to stop, and he signalled the engineer to put on the emergency brakes. The engineer did this, and the train ran about 800 feet before being brought to a stop.

The fact questions as to rate of speed at which the train was running as it approached the crossing, and as to the distance intervening the crossing and the rear end of the east bound train, were determinable by the jury from circumstances now to be pointed out. It will be remembered that the testimony of Johnson shows that the east bound train was between Crow and the oncoming train when Crow passed Johnson at the turn in the road. Crow was then about eighty or eighty-five feet from the crossing, and there is evidence to show that he travelled this distance at the rate of ten miles per hour. The fireman was keeping a lookout from the south side of the engine cab. He testified that he first saw Crow's coupe when it was about fifty feet from the crossing. The jury may have very properly concluded that up to that time the east bound train was between the fireman and Crow, as the latter drove from the "turn" in the highway to the crossing. If the jury reached this conclusion, and proceeded to determine the rate of speed at which Crow drove to the crossing, then the question of proximity, in point of time, of the west bound train to the crossing when it passed from behind the east bound train, became solvable by calculation. If the fifty feet which inter-

vened between Crow and the crossing was made by Crow at a speed of ten miles an hour, but three and one-half seconds elapsed. If the jury so found the facts to be, then the further conclusion was inevitable that the west bound train was running *at least* fifty miles an hour: For the physical facts indisputably show that the rear end of the east bound train had to be at least 259 feet east of the crossing before a train on the mainline could pass. Still assuming that the jury found that the fireman saw the Crow coupe immediately as the locomotive passed the rear end of the east bound train three and one-half seconds before the collision occurred, at which time the crossing, according to the fireman's testimony, was about 500 feet away, a process of calculation will show that the west bound train was running ninety-nine miles an hour. But whether the jury concluded that the rear end of the east bound train was 259 feet from the crossing, or was 500 feet, or was at some point between these two extremes, the fact remains that there is evidence to show that the west bound train ran the distance in about three or four seconds of time, at a high rate of speed, and that prior to that time said train was not visible to Crow. It was the province of the jury to determine, from the facts and circumstances in evidence, that the railway company ought to have anticipated that the running of its train at the high rate of speed it did, and at the place and under the circumstances it did, would probably result in injury or death to some highway traveller, situated as Crow was, notwithstanding such traveler exercised ordinary care for his own safety. There is some evidence raising the fact issues which were submitted to the jury under Special Issues Nos. 5, 6 and 7.

■ The plaintiff in error insists that contributory negligence, on the part of Crow, is conclusively established by the evidence. It was the duty of Crow, as he approached the crossing, to use ordinary care to discover approaching trains and to avoid coming into collision with them. But before it can be said, as a matter of law, that he was negligent in this respect, the proof of such negligence must be so conclusive that reasonable minds could not differ as to the conclusion to be drawn therefrom. Boyd v. St. Louis S. W. Ry. Co., 101 Texas, 415, 108 S. W., 813. With this rule held in mind, we now take up pertinent facts. The operatives of the west bound train gave the statutory crossing signals, and the crossing bell was ringing. There is little room to doubt that, under the circumstances, an ordinarily prudent man in Crow's situation, though using ordinary care for

his own safety, would probably not have heard these signals. When the train whistle was sounded, Crow still was travelling on that part of the highway which was muddy and boggy; the train was behind him; a strong north wind was blowing; and his car windows, except the window on the left side, was closed. There is a strong probability that his attention was occupied mostly by the difficulties of travel arising from the muddy condition of the road. Under these circumstances reasonable minds might conclude that he did not hear the whistle. In respect to his hearing the locomotive bell, and the crossing bell, as he neared the crossing, the evidence is likewise inconclusive. Johnson, who was in an open car which was standing still, at a point some eighty or eighty-five feet from the crossing, did not hear either the crossing bell or the locomotive bell. The roughness of the road between the "turn" and the crossing, together with the strong wind that was blowing, probably caused some noise to attend the operation of the coupe. This noise and the closed windows might have prevented an ordinarily prudent man in Crow's situation from hearing these bells ring. These circumstances are capable of affording to reasonable minds an explanation of Crow's failure to heed these warning signals. The failure of Crow to see the west bound train, as he drove from the turn in the road to a point fifty feet from the crossing, could reasonably be attributed to the fact that the east bound train hid the other train from his view. It is not at all improbable that, during this period of his progress to the crossing, he looked eastward for the purpose of ascertaining if a train was coming from that direction, but failed to discover the west bound train. The weather was damp and cloudy, the windows of the coupe were closed; therefore the significant reflection, above the coaches of the east bound train, which Johnson saw, probably escaped Crow's notice; or, if noticed, was ascribed by him to the lights of the coaches of the east bound train. At any rate, it was the province of the jury, within the bounds of reason, to judge of the probabilities arising from the circumstances in evidence, including the probability of Crow's attributing the illumination of the crossing, as he proceeded towards it, to the headlights of the coupe and the truck. Furthermore, the circumstances in evidence do not exclude the probability of Crow's attention being directed, during most of the last three or four seconds of his life, to ascertaining if a train was coming from the west. The obstruction on that side of him was nearer to the crossing than was the east bound train on the other side, some 259 to 500 feet away.

As has been shown, the freight depot, etc., was about 230 feet west of the crossing, and would have obstructed Crow's range of vision down the track in that direction, until he reached a point about twelve or fifteen feet from the crossing. It is in testimony that just before the collision occurred, and while the coupe still was a few feet from the crossing, the coupe swerved westward and its speed was suddenly increased. The jury may have found explanation of this occurrence in the probability of Crow's attention, during the preceding three or four seconds of time, being directed to conditions on the west side of him; and, having satisfied himself that no train was coming from that direction, turned to see the west bound train almost upon him. Probably overwhelmed by terror, he pressed his foot on the accellerator instead of the brake lever of his coupe.

In view of all the circumstances shown, it cannot be said as a matter of law, that Crow was guilty of contributory negligence. Trochta v. Missouri, K. & T. Ry. Co., 218 S. W., 1038; Barron v. Houston, E. & W. T. Ry. Co., 249 S. W., 825; Hines v. Arrant, 225 S. W., 767 (writ refused); Jones v. Louisiana & W. Ry. Co., 243 S. W., 976.

■ The plaintiff in error objected to the submission to the jury of Special Issues Nos. 5 and 6 on the ground that the jurors were not advised as to what facts and circumstances surrounding the operation of the train might be considered in passing on the issue as to whether or not the train was being run at a dangerous rate of speed. The trial court overruled the objection. It is to be noted that the court, in submitting these special issues, did not confine the jury to a consideration of such "facts and circumstances surrounding the operation of said train" as are alleged in the pleadings. There are facts and circumstances in evidence which are not pleaded by either party, but which the jury might well have considered themselves authorized to take into consideration in determining these special issues. For instance, the jury might have understood that they were authorized to consider, in respect to those issues, the fact that the night was drizzly and cloudy; or the fact that a strong north wind was blowing; or the fact that there were chug holes in the highway where it crossed the railroad right-of-way. None of these facts were alleged in the pleadings, yet under said special issues, as submitted, the jury were authorized to consider, and perhaps did consider, these facts, and give some weight to them, in answering said special issues. The trial court erred in overruling said objection of the plaintiff in error to Special Issues 5 and 6; and because of

this error, the judgment of the trial court, and that of the Court of Civil Appeals affirming same, should be reversed and the cause remanded.

The foregoing opinion is adopted as the opinion of the Supreme Court, and judgment will be entered in accordance therewith.

C. M. CURETON, Chief Justice.